AO 106 (Rev. 04/010) Application for Search Warrant   AUTHORIZED AND APPROVED/DATE: 7/13/26 T. Edgmon

# UNITED STATES DISTRICT COURT
for the
WESTERN _____ DISTRICT OF _____ OKLAHOMA

FILED 7/13/26

JOAN KANE
U.S. DISTRICT COURT
BY CLERK
WESTERN DIST. OKLA.
DEPUTY

JUL 13 2026

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| Digital Devices in the custody | ) Case No: M-26-343-ALM |
| of the Federal Bureau of Investigation at | ) |
| 3301 W. Memorial Road | ) |
| Oklahoma City, OK 73134 | ) |

## APPLICATION FOR SEARCH WARRANT

I, a federal law enforcement officer or attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property *(identify the person or describe property to be searched and give its location)*:

See Attachment A, which is incorporated by referenced herein.

Located in the Western District of Oklahoma, there is now concealed:

See Attachment B, which is incorporated by referenced herein.

The basis for the search under Fed. R. Crim.P.41(c) is(*check one or more*):
- ☒ evidence of the crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252A(a)(2) | Receipt of Child Pornography |
| 18 U.S.C. §§ 2252A(a)(5)(B) | Possession of and Access with Intent to View Material Containing Child Pornography |

The application is based on these facts:

See attached Affidavit of Special Agent Kalli Wakefield, Federal Bureau of Investigation, which is incorporated by reference herein.

- ☒ Continued on the attached sheet(s).
- ☐ Delayed notice of [No. of Days]  days *(give exact ending date if more than 30 days)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet(s).

*Applicant's signature*

Kalli Wakefield
Special Agent
Federal Bureau of Investigation

Sworn to before me and signed in my presence.

Date: ___7/13/26___

*Judge's signature*

City and State:  Oklahoma City, Oklahoma

AMANDA L. MAXFIELD, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Kalli Wakefield, Special Agent with the Federal Bureau of Investigation ("FBI"), Oklahoma City, Oklahoma, being duly sworn, depose and state as follows:

1.      I have been employed as a Special Agent of the FBI since September of 2022 and have been assigned to the Oklahoma City FBI Field Office since February of 2023. During that time, I have conducted a wide variety of investigations, including cases involving child pornography and sexual exploitation of children.

2.      As a Special Agent, I am authorized to investigate violations of the laws of the United States and to execute warrants issued under the authority of the United States.

3.      The information contained in this Affidavit is based upon my personal knowledge and observation, my training and experience, conversations with other law enforcement officers and witnesses, and review of documents and records. This Affidavit is made in support of an application for a warrant to search nine digital devices that were seized during a residential search warrant, which are presently located at the Oklahoma City FBI Field Office Evidence Control Room, within the Western District of Oklahoma.[1] These items are as follows: a black flash drive, a gray 8BitDo storage device, a white USB device, a silver iPad with a white keyboard model A2228, a white MacBook Serial Number 45039ZESF5W Model Number A1342, a silver Mac Mini Serial Number C07GX11UDJD1, a rose gold iPhone with cracked back glass, a white iPhone with rusted edges, and a matte white iPhone (**SUBJECT DEVICES**). As set forth below, there is

_____

[1] To my knowledge, these devices were not manufactured within the state of Oklahoma.

probable cause to believe that the Subject Device contains instrumentalities, fruits, and evidence of violations of 18 U.S.C. § 2252A(a)(2) (Receipt of Child Pornography) and 18 U.S.C. § 2252A(a)(5)(B) (Possession of and/or Accessing with Intent to View Child Pornography).

5.    Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me regarding this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to support the issuance of a search warrant.

## TERMS

6.    Based on my training and experience, I use the following technical terms and definitions:

a.    An Internet Protocol ("IP") address is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range of 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static, or long-term, IP addresses. Other computers have dynamic, or frequently changing, IP addresses.

b.    Single-source download applies to a file that is downloaded from one IP address only. In peer-to-peer ("P2P") software, users often download different parts of the same file from many other users at once in an attempt to gain the file

2

quicker. A single-source download comes from one user/IP address instead.

c.      A <u>computer</u> is an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

## DEFINITIONS

7.      The following definitions apply to this Affidavit and Attachment B:

a.      "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

b.      "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

c.      "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct or the visual depiction has been created, adapted, or modified to appear that an identifiable

3

minor is engaged in sexually explicit conduct. Child pornography is also referred to as "child sexual abuse material" or "CSAM."

d.      "Cloud storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet.

e.      "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. See 18 U.S.C. § 1030(e)(1).

f.      "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices,

4

mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

g.     "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

h.     "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use computer hardware, computer software, or other related items.

i.     "Computer software," as used herein, is digital information that can be interpreted by a computer and any of its related components to direct the way it works. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

j.     A "domain name" is a unique name that identifies a website on the

5

Internet, and is the text that users type into a browser to access that website.

k.      A provider of "Electronic Communication Service" ("ESP"), as defined in 18 U.S.C. § 2510(15), is any service that provides to users thereof the ability to send or receive wire or electronic communications.  For example, "telephone companies and electronic mail companies" generally act as providers of electronic communication services.  See S. Rep. No. 99-541 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3568.

l.      The "Internet" is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

m.      "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

n.      An "Internet Protocol address" or "IP address," as used herein, refers to a unique numeric or alphanumeric string used by a computer or other digital device to access the Internet.  Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination.  Most Internet Service Providers ("ISPs") control a range of IP addresses.  IP addresses

6

can be "dynamic," meaning that the ISP assigns a different unique number to a computer or device every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet. ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

o.    "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

p.    "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a game.

q.    "QR code," as used herein, consists of an array of black and white squares, typically used for storing URLs or other information for reading by the camera on a smartphone.

r.    "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

s.    "Remote computing service," as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

t.    "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b)

7

bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

u.    A "storage medium" is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, "thumb," "jump," or "flash" drives, CD-ROMs, and other magnetic or optical media.

v. .    "URL" is an abbreviation for Uniform Resource Locator and is another name for a web address. URLs are made of letters, numbers, and other symbols in a standard form. People use them on computers by clicking a pre-prepared link or typing or copying and pasting one into a web browser to make the computer fetch and show some specific resource (usually a web page) from another computer (web server) on the Internet.

w.    "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

## BACKGROUND ON CRYPTOCURRENCY

8.    From my training and experience, and from speaking with forensic accountants and other law enforcement agents who have experience with cryptocurrency, I know the following:

a.    "Cryptocurrencies" or "virtual currencies" are digital representations of value that, like traditional coin and paper currency, function as a medium of

8

exchange (*i.e.*, they can be digitally traded or transferred and can be used for payment or investment purposes). Virtual currencies are a type of digital asset separate and distinct from digital representations of traditional currencies, securities, and other traditional financial assets. The exchange value of a particular virtual currency generally is based on agreement or trust among its community of users. Some virtual currencies have equivalent values in real currency or can act as a substitute for real currency, while others are specific to particular virtual domains (*e.g.*, online gaming communities) and generally cannot be exchanged for real currency. Cryptocurrencies are types of virtual currencies, which rely on cryptography for security. Cryptocurrencies typically lack a central administrator to issue the currency and maintain payment ledgers. Instead, cryptocurrencies use algorithms, a distributed ledger known as a blockchain, and a network of peer-to-peer ("P2P") users to maintain an accurate system of payments and receipts. Bitcoin ("BTC"), Litecoin ("LTC"), Monero ("XMR") are three popular types of cryptocurrencies, but there are multiple other types of cryptocurrencies as well.

b.      A private key is a cryptographic key that is uniquely associated with an entity and not made public. In the blockchain and virtual currency context, virtual currency addresses are controlled using a unique corresponding private key, the equivalent of a password, which is needed to access the funds associated with the address. Only the holder of an address's private key can authorize a transfer of virtual currency from that address to another address.

9

c.    A public key is a cryptographic key that is uniquely associated with a person or entity and is designed to be made public. The public key is paired with, and derived from, a private (secret) key. However, knowing the public key does not reveal any information about the private key. In the blockchain and virtual currency context, a virtual currency address is the hashed value of a public key and acts as an identifier on a blockchain.

d.    Bitcoin (or "BTC") is a type of virtual currency. Unlike traditional, government-controlled currencies (*i.e.*, fiat currencies), such as the United States dollar, Bitcoin is not managed or distributed by a centralized bank or entity. Because of that, Bitcoin can be traded without the need for intermediaries. Bitcoin transactions are approved/verified by computers running Bitcoin's software. Those computers are called network nodes. Each node uses cryptography to record every Bitcoin transaction on the Bitcoin blockchain. The Bitcoin blockchain is a public, distributed ledger.    Bitcoin can be exchanged for fiat currency, other virtual currencies, products, and services. Litecoin (or "LTC") is another type of virtual currency that is commonly used and exchanged in a similar manner.

e.    A blockchain is a digital ledger run by a decentralized network of computers referred to as "nodes." Each node runs software that maintains an immutable and historical record of every transaction utilizing that blockchain's technology. Many digital assets, including virtual currencies, publicly record all of their transactions on a blockchain, including all of the known balances for each virtual currency address on the blockchain. Blockchains consist of blocks of

10

cryptographically signed transactions, and blocks are added to the previous block after validation and after undergoing a consensus decision to expose and resist tampering or manipulation of the data. There are many different blockchains used by many different virtual currencies. For example, BTC in its native state exists on the BTC blockchain, while LTC exists in its native state on the LTC network.

f.      To transfer BTC to another BTC address, the sender transmits a transaction announcement, which is cryptographically signed with the sender's private key, across the peer-to-peer BTC network.  To complete a transaction, a sender needs only the BTC address of the receiving party (who also has a private key) and the sender's own private key.  These two keys by themselves rarely reflect any identifying information about either sender or recipient.  As a result, little-to-no personally identifiable information about the sender or recipient is transmitted in a BTC transaction itself.  Once the sender's transaction announcement is verified by the network, the transaction is added to the blockchain.  The blockchain logs every BTC address that has ever received BTC and maintains records of every transaction for each BTC address. This same process is true for LTC transactions.

g.      While the identity of a BTC address owner is generally anonymous (unless the owner opts to make information about the owner's BTC address publicly available), investigators can use the blockchain to identify the owner of a particular BTC address in the following way.  Because the blockchain serves as a searchable public ledger of every BTC transaction, investigators can trace transactions to BTC virtual asset service providers ("VASP").  Because VASPs generally collect

11

identifying information about their customers, subpoenas or other appropriate legal process submitted to the VASP, in some instances, reveal the true identity of an individual responsible for a BTC transaction. Again, the same is true for LTC transactions.

h.    To conduct blockchain analysis, law enforcement officers use reputable, free open-source blockchain explorers, as well as commercial tools and services. These commercial tools are offered by different blockchain-analysis companies. The analysis can also reveal additional addresses controlled by the same individual or entity. "For example, when an organization creates multiple [Bitcoin] addresses, it will often combine its [Bitcoin] addresses into a separate, central [Bitcoin] address (i.e., a "cluster"). It is possible to identify a 'cluster' of [Bitcoin] addresses held by one organization by analyzing the [Bitcoin] blockchain's transaction history. Open-source tools and private software products can be used to analyze a transaction." *United States v. Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020). Banks and law enforcement worldwide use this third-party blockchain-analysis software as, among other things, an anti-money laundering software. It has supported many investigations and been the basis for numerous search and seizure warrants. Further, computer scientists have independently shown that they can use these "clustering" methods as clues to analyze how BTC are aggregated or split up, and to identify BTC addresses and their respective account owners.

i.    Co-spending, also known as "common spending" or "common-input," occurs when multiple virtual currency addresses are used as inputs to fund a

12

transaction. If two or more addresses are inputs for the same transaction with one output, then one can infer that those two or more input addresses are controlled by the same user. This is because the transaction must be signed by each of the private keys corresponding to the input addresses, meaning that the person conducting the transaction would need to have control of the private keys for each input address. Co-spending analysis is one of the most common methods used to attribute addresses to the same entity for transactions on the Bitcoin or similar blockchain.

j.    A VASP, also called a cryptocurrency exchange, is a platform used to buy and sell virtual currencies. VASPs allow users to exchange their virtual currency for other virtual currencies or fiat currency, and vice versa. Many VASPs also store their customers' virtual currency addresses in hosted wallets. VASPs can be centralized (i.e., an entity or organization that facilitates virtual currency trading between parties on a large scale and often resembles traditional asset exchanges like the exchange of stocks) or decentralized (i.e., a P2P marketplace where transactions occur directly between parties). The cryptocurrency transactions discussed in this affidavit involve BTC. BTC is traded and sold on a number of VASPs. One example of a VASP is Coinbase, Inc.

k.    A transaction hash, also called a transaction ID, is a unique string of characters which identifies a specific transaction on the blockchain—akin to a serial number or accounting journal entry number. A transaction hash is assigned to a transaction when it is added to the blockchain, and it is generated by applying a hash function to the transaction details, including the sender's address, the receiver's

13

address, and the amount of virtual currency being sent. Transaction hashes can be found on blockchain explorers and can be used to verify and track transactions.

## BACKGROUND ON COINBASE

9.      Coinbase, Inc. ("Coinbase"), is an American company that operates a cryptocurrency exchange platform. It is the largest cryptocurrency exchange in the United States in terms of trading volume. I also know that it is free for users to register for a Coinbase account and that Coinbase maintains Know Your Customer ("KYC") information on their users and controls the private keys for user wallets (also known as "hosted wallets"). I also know that a Coinbase user can receive many different types of cryptocurrencies and is provided with unique deposit addresses at the relevant exchange. For instance, a user can have a unique BTC deposit address, a unique LTC deposit address, and so on. These unique addresses are under the same user's account similar to how an individual who has an account at a traditional bank may have a checking account and multiple savings accounts. Coinbase is responsive to legal process.

## BACKGROUND ON THE TOR NETWORK

10.     The Internet is a global network of computers and other devices. Devices directly connected to the Internet are uniquely identified by IP addresses, which are used to route information between Internet-connected devices. Generally, when one device requests information from a second device, the requesting device specifies its own IP address so that the responding device knows where to send its response. On the Internet, data transferred between devices is split into discrete packets, each of which has two parts:

14

a header with non-content routing and control information, such as the packet's source and destination IP addresses; and a payload, which generally contains user data or the content of a communication.

11.    The website further described below operated on the Tor network, which is a computer network available to Internet users that is designed specifically to facilitate anonymous communication over the Internet. The Tor network attempts to do this by routing Tor user communications through a globally distributed network of relay computers, along a randomly assigned path known as a "circuit." Because of the way the Tor network routes communications through the relay computers, traditional IP address-based identification techniques are not effective.

12.    To access the Tor network, a user must install Tor software. That is most easily done by downloading the free "Tor browser" from the Tor Project, the private entity that maintains the Tor network, via their website at www.torproject.org.[2] The Tor browser is a web browser that is configured to route a user's Internet traffic through the Tor network.

13.    As with other Internet communications, a Tor user's communications are split into packets containing header information and a payload and are routed using IP addresses. In order for a Tor user's communications to be routed through the Tor network, a Tor user necessarily (and voluntarily) shares the user's IP address with Tor network relay computers, which are called "nodes." This routing information is stored in the header

---

[2] Tor users may also choose to manually configure a web browser or other application to route communications through the Tor network.

portion of the packet. As the packets travel through the Tor network, each node is able to see the address information of the previous node the communication came from and the next node the information should be sent to. Those Tor nodes are operated by volunteers – individuals or entities who have donated computers or computing power to the Tor network in order for it to operate.

14.    Tor may be used to access open-Internet websites like www.justice.gov. Because a Tor user's communications are routed through multiple nodes before reaching their destination, when a Tor user accesses such an Internet website, only the IP address of the last relay computer (the "exit node"), as opposed to the Tor user's actual IP address, appears on that website's IP address log.    In addition, the content of a Tor user's communications are encrypted while the communication passes through the Tor network. That can prevent the operator of a Tor node from observing the content (but not the routing information) of other Tor users' communications.

15.    The Tor Project maintains a publicly available frequently asked questions (FAQ) page, accessible from its website, with information about the Tor network. Within those FAQ, the Tor Project advises Tor users that the first Tor relay to which a user connects can see the Tor user's actual IP address. In addition, the FAQ also cautions Tor users that the use of the Tor network does not render a user's communications totally anonymous. For example, in the Tor Project's FAQ, the question "So I'm totally anonymous if I use Tor?" is asked, to which the response is, in bold text, "No."

16.    The Tor Network also makes it possible for users to operate or access websites that are accessible only to users operating within the Tor network. Such websites

16

are called "hidden services" or "onion services." They operate in a manner that attempts to conceal the true IP address of the computer hosting the website. Like other websites, hidden services are hosted on computer servers that communicate through IP addresses. However, hidden services have unique technical features that attempt to conceal the computer server's location.

17.    Unlike standard Internet websites, a Tor-based web address is comprised of a series of either 16 or 56 algorithm-generated characters, for example "asdlk8fs9dflku7f," followed by the suffix ".onion." Ordinarily, investigators can determine the IP address of the computer server hosting a website (such as www.justice.gov) by simply looking it up on a publicly available Domain Name System ("DNS") listing. Unlike ordinary Internet websites, however, there is no publicly available DNS listing through which one can query the IP address of a computer server that hosts a Tor hidden service. So, while law enforcement agents can often view and access hidden services that are facilitating illegal activity, they cannot determine the IP address of a Tor hidden service computer server via public lookups. Additionally, as with all Tor communications, communications between users' computers and a Tor hidden service webserver are routed through a series of intermediary computers. Accordingly, neither law enforcement nor hidden-service users can use public lookups or ordinary investigative means to determine the true IP address – and therefore the location – of a computer server that hosts a hidden service.

## BACKGROUND OF INVESTIGATION

18.    In January 2024, an FBI employee conducting a search on the Tor network observed a ".onion" site, hereinafter the "TARGET WEBSITE," which advertised itself as

17

the largest open library of free child pornography videos and images. Displayed on the homepage of the site were photos and videos which depicted CSAM.

19.     Below the main homepage banner were two sections labeled "Popular Photos" and "Popular Videos." Each section depicted a grid of thumbnail images of content.[3] If the user clicked the thumbnail to view the full content, they would be taken to the content page, where the material would appear blurred, and a prompt would appear requesting payment for full access. One image in the Popular Photos section appeared to depict a prepubescent female lying nude from the waist down on a textile surface. The individual displayed physical characteristics consistent with a prepubescent child, including the absence of pubic hair, a small body frame, and low muscle mass and definition. The child's legs were spread apart and a device that appeared to be used for sexual purposes was inserted into the child's anus with an adult's hand holding the object.

20.     The TARGET WEBSITE offered various subscription services for access to the TARGET WEBSITE's content ranging from one (1) day access for $15 USD to a lifetime subscription for $300 USD. Customers could purchase subscriptions using cryptocurrency. More specifically, customers could pay with cryptocurrency either in BTC or LTC.

21.     In May 2024, an FBI online covert employee ("OCE") conducted a covert purchase using BTC of a subscription to the TARGET WEBSITE. The OCE had to navigate to the payment options screen and select the BTC or LTC payment option for the

---

[3] A thumbnail is a small, compressed, and low-resolution version of a larger image or video, primarily used as a preview.

18

pricing package of interest. After selecting the BTC payment option for the target package, the OCE was directed to a screen with a QR code and a BTC address with the instructions "Please send exactly [amount] bitcoin to [address]" displayed. Upon successful payment, the OCE was granted full access to the content available on the TARGET WEBSITE which included more CSAM videos and images than were previously available on the home page. After paying for access to the site, the OCE could also utilize the search feature to find specific content. Upon selecting an image or video, the content would load, and the OCE could click the "Download Media" button to download it. The OCE downloaded videos and images and verified that they met the federal definition of child pornography as set out in 18 U.S.C. § 2256(8)(A).

22.    An example of a video downloaded by the OCE was an 11-second video titled, "Tara8yrMasturbation unreleased uncensored RPEX21" which depicted what appeared to be a prepubescent female lying nude on a bed watching television with her leg behind her head. The minor appeared to be prepubescent as she had little to no breast development, no pubic hair, and a body stature smaller than an average teenager. The minor was repeatedly inserting multiple fingers into her vagina. At the time of the download, the video received 2,316 views.

## FORENSIC IMAGE OF THE TARGET WEBSITE SERVER

23.    In or around January 2024, the FBI inquired with a foreign entity if the entity was aware of the TARGET WEBSITE and whether the entity had any identifying information regarding the site. The foreign entity has a history of providing reliable and accurate information to U.S. law enforcement and has assisted the FBI in the past on

19

investigations regarding Tor network-based websites and other large-scale cyber-related matters. The foreign entity provided the FBI with the true IP address of the TARGET WEBSITE and the name of the TARGET WEBSITE's web hosting service provider.

24.    In October 2024, the FBI obtained a forensic image[4] of the TARGET WEBSITE server along with subscriber and payment information from the web hosting service provider. Records from the web hosting service provider revealed the TARGET WEBSITE server infrastructure was purchased with BTC. A review of the forensic image of the TARGET WEBSITE revealed a range of artifacts associated with the site. These included, but were not limited to: child pornography files that were visible on the live site and downloaded by the OCE; Tor configuration files for the .onion address; a database labeled "cpsite" containing tables related to media, invoices (including transaction records), and user membership; various PHP, JSON, and shell script files executed by the site; and front-end assets such as CSS, HTML, and image files used on the homepage. The forensic image also contained BTC and LTC wallet addresses associated with payments made for access to the site.

25.    Law enforcement ingested the cryptocurrency wallet addresses extracted from the server's wallet data files into Chainalysis, a blockchain analytics platform, for further analysis. This analysis identified a total of 219 BTC and LTC transactions linked to purchases from the TARGET WEBSITE by wallets associated with Coinbase. Of these, 193 transactions were direct payments to wallets confirmed to be associated with the

---

[4] FBI served legal process to the U.S. based server that was hosting the TARGET WEBSITE and received a snapshot image of the server.

TARGET WEBSITE, based on artifacts recovered from the server. The remaining 26 transactions were linked to the site through co-spending analysis. After tracing cryptocurrency wallet addresses and linking multiple site-related transactions to Coinbase accounts, law enforcement moved to identify the site's customers who used Coinbase to pay for access. Consequently, on August 25, 2025, the FBI served a search warrant on Coinbase, requesting subscriber and account records tied to the BTC and LTC transaction hashes related to payments made to the TARGET WEBSITE, as well as the corresponding BTC and LTC wallet addresses found in the server data. Using this information, on August 28, 2025, Coinbase provided law enforcement with the records associated with each relevant transaction and corresponding account.

## IDENTIFICATION OF THE TARGET THAT PAID THE TARGET WEBSITE

26.    A review of the Coinbase records shows that on March 20, 2024, at 21:38 P.M. an account in the name of Justin James Gould ("GOULD") sent 0.00028182 BTC worth approximately $18 USD on that date, from wallet address 5b298e6059fa21374dec15b associated with the GOULD's Coinbase account to a cryptocurrency address associated with the TARGET WEBSITE. This payment amount is consistent with the advertised price for access to the TARGET WEBSITE for one day.

27.    The Coinbase records further indicated GOULD was born in October 1998, which matches the GOULD's date of birth according to background checks conducted by law enforcement. The social security number is listed as XXX-XX-9168 which matches GOULD's social security number. The address listed on the account is 2801 Morgan Trace

21

Road,[5] Yukon, Oklahoma 73099. The registered email addresses are listed as justinisgreat100@gmail.com and jgould1998@gmail.com.

28.    A Virginia driver's license depicting an individual with GOULD's same name and date of birth, was uploaded to the account as part of Coinbase's KYC requirement. The information and image match that of GOULD.

29.    On May 7, 2026, Google LLC responded to legal process related to the email address    Justinisgreat100@gmail.com.    The    documents    provided    show    that Justinisgreat100@gmail.com belongs to GOULD. The email account was created on April 18, 2010.

30.    On May 7, 2026, Google LLC responded to legal process related to the email address    Jgould1998@gmail.com.    The    documents    provided    show    that Jgould1998@gmail.com belongs to GOULD. The email account was created on May 11, 2011. The recovery phone number associated with the account is 804-677-2376.

31.    Through open-source checks, the phone number 804-677-2376 checks back to the SUBJECT.

32.    On May 14, 2026, AT&T responded to legal process related to the subscriber information for Internet service for 2801 Morgan Trace Road, Yukon, Oklahoma 73099. The customer listed on the account is Gloria Gould[6]. The start date for this account is September 2, 2020.

---

[5] The Coinbase return indicated that the address was 2801 Morgan Trace Road, Yukon, Oklahoma 73099. The actual address does not include "Road."
[6] Through open-source checks, the FBI believes Gloria Gould is GOULD's mother.

## IDENTIFICATION OF THE SUBJECT PREMISES

34.    A search of a public records database that provides names, dates of birth, addresses, associates, telephone numbers, email addresses, and other information was conducted for GOULD. These public records indicated that GOULD resides at 2801 Morgan Trace Road, Yukon, Oklahoma 73099 and has since around September 2020.

35.    On or about May 26, 2026, vehicle registrations revealed that GOULD with a date has a Cadillac Escalade (Escalade) bearing an Oklahoma plate TAZ733. This registration was issued on May 22, 2026, and expires on March 31, 2027. This Escalade is registered to GOULD at 2801 Morgan Trace, Yukon, Oklahoma 73099.

36.    On or about May 19, 2026, the Canadian County Oklahoma Assessor's webpage indicated that Gloria Gould was the owner of 2801 Morgan Trace, Yukon, Oklahoma 73099 and has been since around September 2020.

37.    On June 2, 2026, three federal search warrants were signed in the Western District of Oklahoma. These search warrants were a residential search warrant for 2801 Morgan Trace, Yukon, Oklahoma 73099, a vehicle search warrant for the Escalade, and a person search warrant for GOULD.

38.    On June 3, 2026, the FBI executed all three of the search warrants that were signed on June 2, 2026. During the execution of the search warrants, there were multiple digital devices seized, including the **SUBJECT DEVICES**. Some of the devices that were seized during the course of the search warrant have been forensically examined. The remaining devices, the **SUBJECT DEVICES**, were not initiated before the time frame of the original search warrants expired.

23

39.    The devices that have been reviewed included images depicting nude males and females, however, the images were Anime and cartoon-like, so I was not able to determine the ages that were being portrayed in the images. There was a 3D animated video on one of the devices that is described below:

Filename: Kiss Goodnight
Length: 3:16
Description: The video starts on the exterior of a house and moves into a bedroom with a light on. A clothed female is sitting on a bed with a cell phone to her ear. A minor male is standing on the floor next to the bed in a pair of boxer shorts. The minor sits on the bed next to the female. The female touches the minor's head and his cheek with her hand. The video moves to show a bottle of lotion that is sitting on a table next to the bed. The female grabs the lotion. The minor takes off his boxer shorts, and the animation zooms in on the minor's penis. The female holds the minor's penis and moves her hand up and down. The minor moves on top of the female's back and inserts his penis into her anus. The minor moves back and forth in a rocking motion, starting slow and then speeding up. The female remains wearing her shirt and thong underwear. The video ends by zooming out of the bedroom and showing an exterior view of the house with the bedroom illuminated.

40.    The devices that have been reviewed also contained search terms that suggest GOULD was searching for child pornography. Some of the search terms that were found within the review of the devices include: "loli, incest adultery, mother and child incest/ The Penny Diary: Season 2", "The Secret Childcare Rapist – 9hentai – Hentai Manga, Read Hentai, Doujin Manga", "Family Cam: Dad Amateur Porn | xHamster", "Fuck Mommy in the Bathroom: Mom Homemade Porn | xHamster", and "Toddlercon – 9hentai – Hentai Manga, Read Hentai, Doujin Manga."

41.    GOULD agreed to talk with FBI agents on the day of the execution of the search warrants. During the interview, GOULD described having a Coinbase account that he used to purchase marijuana on the Dark Web at least one time but maybe two times.

24

The Coinbase account was associated with the email address jgould1998@gmail.com, which was the email address that GOULD said belonged to him. GOULD told agents that he did not use the Coinbase account to purchase anything else.

42.    When GOULD was asked if there would be any evidence of child pornography found during the search, GOULD responded, "No, there should not be. No. No, I guarantee it, no. And if there is, no. No, I don't, I have never looked at that." GOULD admitted that there would be "porn stuff" on his Reddit searches, but not children. GOULD told agents that he does not buy "regular" pornography and would not buy child pornography. GOULD indicated to agents that he was uncomfortable and terminated the interview.

## BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET

43.    I have had both training and experience in the investigation of computer-related crimes. Based on my training, experience, and knowledge, I know the following:

a.    Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

b.    Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable or via wireless connections such as "WiFi" or "Bluetooth." Photos and videos taken on a digital camera or

25

smartphone may be stored on a removable memory card in the camera or smartphone. These memory cards are often large enough to store thousands of high-resolution photographs or videos.

c.    A modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections. Electronic contact can be made to literally millions of computers around the world. Child pornography can therefore be easily, inexpensively, and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

d.    The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. Electronic storage media of various types—to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on the computer—can store thousands of images or videos at very high resolution. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices. Some media storage devices can easily be concealed and carried on an individual's person. Smartphones and/or mobile phones are also often carried on an individual's person.

26

e.    The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

f.    Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service that may provide email services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone, or external media in most cases.

g.    A growing phenomenon related to smartphones and other mobile computing devices is the use of mobile applications, also referred to as "apps." Apps consist of software downloaded onto mobile devices that enable users to perform a variety of tasks – such as engaging in online chat, sharing digital files, reading a book, or playing a game – on a mobile device. Individuals commonly use such apps to receive, store, distribute, and advertise child pornography, to interact directly with other like-minded offenders or with potential minor victims, and to access cloud-storage services where child pornography may be stored.

h.    As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (i.e., by saving an email as a file on the computer

27

or saving the location of one's favorite websites in, for example, "bookmarked" files) or unintentional. Digital information, such as the traces of the path of electronic communication, may also be automatically stored in many places (*e.g.*, temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

## CHARACTERISTICS COMMON TO INDIVIDUALS WITH INTENT TO COLLECT, RECEIVE, OR DISTRIBUTE CHILD PORNOGRAPHY

44.     Based on my previous investigative experience related to child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals with the intent to view and/or possess, collect, receive, or distribute images of child pornography:

45.     Individuals with intent to view and/or possess, collect, receive, or distribute child pornography may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

46.     Individuals with intent to view and/or possess, collect, receive, or distribute child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides,

28

and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children often use these materials for their sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

47.     Individuals with intent to view and/or possess, collect, receive, or distribute child pornography almost always possess and maintain their "hard copies" of child pornographic material, that is, their films, videotapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain photos, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

48.     Likewise, individuals with the intent to view and/or possess, collect, receive, or distribute pornography often maintain their collections that are in a digital or electronic format in a secure and private environment, such as a computer and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence or inside the collector's vehicle, to enable the individual to view the collection, which is valued highly.

49.     Individuals with intent to view and/or possess, collect, receive, or distribute child pornography also may correspond with and/or meet others to share information and materials;    rarely    destroy    correspondence    from    other    child    pornography

29

distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interest in child pornography.

50.    Individuals who would know how to access online forums, such as bulletin boards, newsgroups, Internet relay chat, or chat rooms are considered more advanced users and therefore more experienced in acquiring and storing a collection of child pornography images.

51.    Individuals with intent to view and/or possess, collect, receive, or distribute child pornography prefer not to be without their child pornography for any prolonged period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

## BACKGROUND ON DIGITAL MEDIA STORAGE DEVICESAND CHILD PORNOGRAPHY

52.    The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution. Other digital media storage devices (e.g., compact disks, digital video disks, floppy disks, cell phones, Blackberries, iPhones, thumb drives, video gaming stations, etc.) can also store tremendous amounts of digital information, including digital video and picture files.

53.    As is the case with most digital technology, communications by way of computer can be saved or stored on the computer.  Storing this information can be intentional, i.e., by saving an email as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files.  Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others).  In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.  Further, even if deleted, forensic examination can sometimes recover files and data including deleted picture files.

54.    Computers and other digital file storage devices can store the equivalent of thousands of pages of digital information.  Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names.  This requires the searching authorities to examine all the stored data to determine whether it is included in the warrant.  This sorting process can take days or weeks depending on the volume of the data stored, and it would be generally impossible to accomplish this kind of data search on site.  Furthermore, I know that smart cell phones (a type of "computer," as broadly defined in 18 U.S.C. § 1030(e)) can typically "synch" with a traditional desktop or laptop computer. The purpose of synching a smart phone to a traditional computer is to back up data that is stored on the phone so that it is not permanently lost if the portable smart phone is lost or damaged. Also, smart phone users may move files off the smart

31

phone and onto a computer to free up storage space on the smart phone. Similarly, computer (e.g., desktop computers, smart phones, etc.) users may move files off of one computer onto another computer or digital file storage devices such as a thumb drive, a DVD, and an external hard drive to free up space on the computer.

## SEARCHING COMPUTERS

55.    Searching computers for criminal evidence is a highly technical process requiring skill and a properly controlled environment. The search of a computer or computer system is an exacting scientific procedure designed to protect the integrity of the evidence and to recover hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is vulnerable to tampering or destruction, the controlled atmosphere of a laboratory is essential to complete this task. The FBI, Oklahoma City Division ("OCD"), has such a laboratory staffed with certified computer forensic examiners. At least one certified forensic examiner will be present and take custody of any computers and storage media found at the search location. All magnetic storage media will be taken to the FBI OCD lab for analysis. Identical copies of the original storage media will be produced by the assigned forensic examiner so as to maintain the integrity of the original evidence. Due to the fact that child pornography is by its nature contraband, and illegal to possess, making an image of the computer's hard drive and other storage media on site is not a feasible alternative.

## CONCLUSION

56.    As described herein, the TARGET WEBSITE could not generally be accessed through the traditional Internet. Only a user who had installed the appropriate

32

Tor software on the user's computer could access the TARGET WEBSITE. Even after connecting to the Tor network, however, a user would have to find the 16-or-56-character web address of the TARGET WEBSITE in order to access it. Hidden service websites on the Tor Network are not "indexed" by search engines—such as Google—to anywhere near the same degree as websites that operate on the open Internet. Accordingly, it is much more difficult to perform a Google-type search of hidden service websites than it is to search open Internet websites for particular content of interest. Because accessing the TARGET WEBSITE required numerous affirmative steps by the user – to include downloading Tor software, accessing the Tor network, finding the web address for the TARGET WEBSITE, and then connecting to the TARGET WEBSITE via Tor – it is extremely unlikely that any user could simply stumble upon the TARGET WEBSITE without understanding its purpose and content. Thus, any user who accessed the TARGET WEBSITE has, at a minimum, knowingly accessed the TARGET WEBSITE with intent to view child pornography or attempted to do so.

57. Further, by using cryptocurrency tracing techniques law enforcement has identified users who went through multiple additional steps to purchase premium access to the TARGET WEBSITE using their Coinbase accounts. Based on the Coinbase records, law enforcement has been able to identify GOULD who resides at 2801 Morgan Trace Road, Yukon, Oklahoma 73099 who made a purchase of a subscription to the TARGET WEBSITE on March 20, 2024.

58. Thus, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits, and

instrumentalities of these offenses, more fully described in Attachment B, are located on the devices described in Attachment A. I respectfully request that this Court issue a search warrant for the devices described in Attachment A, authorizing the search of the items described in Attachment B.

Respectfully submitted,

Kalli Wakefield
Special Agent

Sworn and subscribed before me this 13 th day of July , 2026.

AMANDA L. MAXFIELD
United States Magistrate Judge

34

## ATTACHMENT A

### <u>DESCRIPTION OF THE SUBJECT DEVICE TO BE SEARCHED</u>



1.  Black Flash Drive



2.  Gray 8BitDo storage device



3.  White USB device



4.  Silver iPad with white keyboard Model A2228

5. White MacBook Serial Number 45039ZESF5W

 

6. Silver Mac Mini Serial Number C07GX11UDJD1

 



7. Rose Gold iPhone with cracked back glass



8. White iPhone with rusted edges



9. Matte white iPhone

## ATTACHMENT B

## LIST OF ITEMS TO BE SEIZED

Evidence of violations of 18 U.S.C. § 2252A(a)(2) (Receipt of Child Pornography) and 18 U.S.C. § 2252A(a)(5)(B) (Possession of and/or Accessing with Intent to View Child Pornography), including:

1.      Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

2.      Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, e-mail messages, chat logs and electronic messages, and handwritten notes) pertaining to the possession, receipt, distribution, or accessing with the intent to view (or the attempt to do so) child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, distribution, or accessing with the intent to view (or the attempt to do so) of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

3.      In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), and visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any means, including, but not limited to, by the United States Mail or by

38

computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

5.    Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages, other digital data files and web cache information) concerning the possession, receipt, distribution, or accessing with the intent to view (or the attempt to do so) of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

6.    Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

7.    Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

8.    Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote

39

computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

9.      Any and all visual depictions of minors engaging in sexually explicit conduct and any and all records indicating the identity of depicted minors.

10.     Any and all documents, records, or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages, and other digital data files), pertaining to the identity of the user of the Subject Device described in Attachment A, including, but not limited to, rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, as well as any emails, usernames, accounts, documents, and chat conversations that aid in identifying the user.

11.     Any and all notes and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, instrumentalities, contraband, and/or fruits described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.

40